## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Case No. 12-40014-JAR |
| | ) |
| **STEVEN COUCH, JR.,** | ) |
| | ) |
| Defendant. | ) |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) |

## <u>MEMORANDUM AND ORDER</u>

Steven Couch Jr. is the sole defendant charged, in a one-count Indictment, with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g).  Defendant filed a Motion to Suppress Evidence (Doc. 33), on September 25, 2012, and filed a supplemental brief on the same motion on December 12, 2012 (Doc. 57).  The Government has filed a response to both the original motion and the supplemental brief.  The Court has fully considered the briefs and the evidence presented at a November 19, 2012 hearing on the motion.  The Court has also reviewed the two audio files and the video submitted into evidence at that hearing, and the Court is prepared to rule.  As described more fully below, the Court denies Defendant's motion to suppress at this time.

The Government has filed a Motion in Limine (Doc. 48), and Defendant has not yet responded.  Because the trial date has been postponed, the Court will not take up the motion in limine until the in limine conference, shortly before the trial.  The Court will not stop the speedy trial clock during the pendency of the in limine motion.

## I.  Factual Background

Defendant and his girlfriend, Carol Williams, had a three-day running argument, from February 14–17, 2011, after Williams allegedly kissed another man at a bar.  Defendant denies that the fight ever became physical but admits that on February 17, he "tor[e] apart the residence," destroying a television and other household items.  That evening, as Williams and Defendant argued, Williams allegedly asked Defendant to let her see his gun, and he allegedly did so, putting a bullet in the gun and then handing it to Williams.  Williams then apparently shot herself in the head, and she died from the wound.

After Williams shot herself, Defendant began CPR and told his father, Steven Couch Sr., to call 911.  When Rachel Larson, a Saline County, Kansas, Sheriff's Deputy arrived, she ordered Defendant to move into the kitchen and away from Williams, who was laying near the gun.  The deputy saw a nine millimeter pistol, a box of ammunition, and a single unfired shell casing on the floor near the couch.

Larson kept her gun pointed at Defendant, who was yelling at her to help Williams, until she recovered the gun.  During the confrontation, Defendant told the deputy that "she shot herself" and that he did not want Williams to die.  Larson eventually put away her firearm and began tending to Williams.

After emergency medical personnel arrived, Larson asked Defendant to exit the trailer and speak with her outside.  Larson could smell alcohol on Defendant's breath, and Defendant was unsteady on his feet and obviously intoxicated.  Defendant described the shooting to Larson and told the deputy that he would "go to prison for this."

According to the deputy, Defendant then put his hands behind his back, to indicate that he should be handcuffed, and he paced in circles and did not answer when pressed for the details

2

related to the shooting.  Larson then put Defendant in the back seat of her patrol car, where she continued questioning him for several minutes.

After an investigator arrived, Larson placed Defendant in handcuffs and then Larson drove him to the Saline County Sheriff's Office.  Larson did not question him on the drive.

Defendant was placed in an interrogation room at the sheriff's office, where a uniformed law enforcement officer stood guard until Investigator Jim Sweeney arrived.  After Sweeney entered and closed the door, he asked Defendant his name and introduced himself.  Sweeney then tried to read Defendant his Miranda rights, but Defendant repeatedly interrupted, stating that he understood his rights and attempting to tell Sweeney what happened.  After several tries, Sweeney stopped interrupting Defendant and let Defendant tell him about the shooting.

After Defendant finished his statement, and before Sweeney asked Defendant any questions, Sweeney read Defendant his Miranda rights.  Defendant responded that he had told him the truth and that was all that he had to say, but then answered several additional questions from Sweeney about the shooting.  Defendant eventually requested a lawyer, and Sweeney stopped questioning him at that time.

Defendant now seeks to suppress both his statements to Larson at the scene of the shooting and his statements to Sweeney in the interrogation room.

## II.    Discussion

### 1.  Defendant's Statements to Larson

Defendant makes two arguments in support of his motion to suppress his statements to Larson.  First, he argues that his conversation with Larson was a custodial interrogation and that, since he did not receive a Miranda warning before talking to Larson, his statements to Larson

should be suppressed.  Second, he argues that he was taken into custody by Larson without probable cause, tainting all interrogation after he was taken into custody.

The Government makes three arguments for the admissibility to Defendant's statements to Larson.  First, the Government argues that Defendant was not in custody when he spoke with Larson, so that a Miranda warning was not required and thus the absence of the Miranda warning does not preclude admission of his statements to her.  Second, the Government argues that Larson's conversation with Defendant was part of a general on-scene investigation, which would not require a Miranda warning.  Third, the Government argues that Defendant made unsolicited statements to Larson, and unsolicited statements are admissible even absent a Miranda warning.

As a general rule,

> Miranda warnings are required when the defendant is in custody and subject to interrogation. In order to determine whether or not a person is in custody for Miranda purposes, a court must examine all relevant facts, the only relevant inquiry being how a reasonable person in the suspect's position would have understood his situation.  If, from an objective viewpoint, someone in [the defendant's] position would reasonably believe [his] freedom of action had been curtailed to a  degree associated with a formal arrest, then [he] would be held in custody during the interrogation.[1]

Thus, a Miranda warning is required when a Defendant is (1) subject to interrogation, and (2) in custody.  For the first prong, interrogation includes "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect."[2]  For the second prong, the Tenth Circuit suggests several factors that are useful in testing the atmosphere of custody, including the extent to which the suspect is made

---

[1]*United States v. Griffin*, 7 F.3d 1512, 1517–18 (10th Cir. 1993) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)) (further citations and quotations omitted).

[2]*Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (footnotes omitted).

aware that he or she is free to refrain from answering questions or to end the interview at will; nature of questioning (limited questioning to confirm an officer's suspicions is less coercive than prolonged accusatory questioning); and whether the atmosphere is "police dominated" (i.e. separation of the suspect from family or colleagues who could offer moral support; isolation in nonpublic questioning rooms; threatening presence of several officers; display of a weapon by an officer; physical contact with the subject; and an officer's use of language or tone of voice in a manner implying that compliance with the request might be compelled).[3]

Here, Larson's questioning was interrogatory. She sought information about Defendant's role in the shooting, and, based on her statements to other officers, she believed that Defendant was involved in the shooting itself. Although the questions themselves were general, based on the circumstances, she knew the questions were reasonably likely to elicit an incriminating response from Defendant. Thus, the questions met Miranda's interrogatory prong.

On the second prong, however, the Court finds that Defendant was not in custody until he sat in Larson's patrol car. There is no evidence as to whether Defendant thought he could refrain from answering or end the interview at will, although he appeared to want to cooperate and volunteered some information before Larson began questioning. The questioning was non-coercive, and it consisted of Larson only asking Defendant to tell her what happened. Finally, the atmosphere was not police dominated. Defendant was in a public location during the interview and was free to walk around or away during the interview, as evidenced by Larson's repeated requests for him to "come here" during the interview. Larson was alone and, on her testimony, did not display her weapon during the questioning, although she did have her weapon

---

[3]*Griffin*, 7 F.3d at 1518–19; *see also United States v. Jones*, 523 F.3d 1235, 1240 (10th Cir. 2008).

drawn when she first responded.  Her tone was not controlling, but rather persuasive, and she did not seek to command Defendant.  From an objective viewpoint, someone in Defendant's position could not reasonably believe his freedom of action had been curtailed to a degree associated with a formal arrest, and so the statements up until Larson placed Defendant in the patrol vehicle are admissible.  After he was in the vehicle, a reasonable person in Defendant's position would believe that his freedom of action had been curtailed to a degree associated with a formal arrest, and thus Defendant was in custody.  This custody, coupled with the continuing interrogative nature of Larson's questions, required a Miranda warning before the questioning could continue.

With regard to the Government's second argument, the Government is correct that police may engage in "[g]eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process" without first providing the Miranda warnings.[4]  But this is not an exception to Miranda; Miranda simply does not apply unless a person is in custody and is undergoing interrogation.  And as discussed above, the questions Larson asked Defendant after placing Defendant in the car required a Miranda warning; the Government's second argument does not avoid this requirement and does not render admissible Defendant's statements to Larson while in the vehicle.

As to the Government's third argument, the Government is correct that any unsolicited statements Defendant made to Larson are admissible; unsolicited statements are admissible even absent a Miranda warning.[5]  But, after reviewing the audiotapes of Larson's interactions with

---

[4]*Miranda*, 384 U.S. at 477–78.

[5]*Id.* at 478 ("Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.").

Defendant, the Court found no answers that would be admissible under this exception that were not already admissible.

Finally, Defendant's argument that he was taken into custody absent probable cause fails. Assuming that Larson took him into custody when she placed him in her vehicle, Larson had probable cause for the arrest.  "Probable cause to arrest exists where, under the totality of the circumstances, a reasonable person would believe that an offense has been committed by the person arrested."[6]  Here, Defendant's initial statement that he was a felon and that he had possession of the gun suffice to allow a reasonable person to believe that Defendant had committed a crime, and Defendant made those statements before Larson took him into custody.

### 2.  Defendant's Statements to Sweeney

Defendant argues that he was taken into custody by Larson without probable cause, tainting all subsequent interrogation.  Defendant also argues that he was not properly Mirandized before he was interrogated by Sweeney, and so the entire conversation should be suppressed. The Government argues that Defendant's statements to Sweeney were a voluntary confession and so are not barred by the apparent lack of a Miranda warning before the first part of the interview.

The Government is correct.  When Sweeney entered the room, he began by saying, "Before I start . . . ," presumably to lead into a Miranda warning, but Defendant interrupted him, saying "I understand, you're going to have to read me my rights."  Defendant repeated his "I understand" statement at 1:07 on the videotape.  Sweeney again tried to read him his rights, at 1:14 on the videotape, and again at 1:25, and at 1:29.  Every time he began, Defendant cut him

---

[6] *United States v. Martin*, 613 F.3d 1295, 1302 (10th Cir. 2010) (quotations omitted).

off and began giving his statement again.  Finally, at 1:30 on the videotape, Defendant says,

"I'm only going to tell you this once," and then offers his statement.  Notably, Sweeney has

asked no questions at this point, and has tried repeatedly to Mirandize Defendant.  Sweeney asks

no questions until after he reads Defendant his Miranda rights, at 2:27 on the videotape.

Sweeney stops questioning Defendant promptly when Defendant requests a lawyer, at 7:05 on

the tape.  Defendant's statements before he was Mirandized are the essence of a voluntary

statement.  Defendant repeatedly interrupted Sweeney and prevented Sweeney from reading him

his rights.  Defendant also repeatedly assured Sweeney that Defendant already knew his rights.

He cannot now argue that his statement should be barred because he offered it before Sweeney

was able to Mirandize him.[7]  Because the Court has determined that Defendant's statements

before the Miranda warning are admissible, the Court need not address Defendant's argument

that the statements after the warning are inadmissible; that argument relied on the inadmissibility

of the pre-Miranda statements.

**IT IS THEREFORE ORDERED BY THE COURT** that the Motion to Suppress (Doc.

33) is **denied.**

**IT IS SO ORDERED.**

Dated:  January 24, 2013                              S/ Julie A. Robinson
                                                     JULIE A. ROBINSON
                                                     UNITED STATES DISTRICT JUDGE

---

[7]*Miranda*, 384 U.S. at 478.